UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PRESTON DIAL FREEMAN, AND TROY CHANCELLOR FREEMAN, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. |
| VS. | ) ) | 3:18-CV-0947-G |
| FIDELITY BROKERAGE SERVICES, LLC, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendant Fidelity Brokerage Services, LLC ("Fidelity") to compel arbitration and stay all proceedings (docket entry 5). For the reasons set forth below, the motion is denied.

### I. BACKGROUND

On April 8, 1993, Nancy Ann Crisler ("Nancy Crisler"), mother of the plaintiffs Preston Dial Freeman and Troy Chancellor Freeman (collectively, the "Freemans"), executed a living trust agreement ("Trust Agreement"). Plaintiffs' Original Petition ("Petition") ¶¶ 8, 9, *attached to* Notice of Removal of Civil Action ("Notice of Removal") (docket entry 1) as Exhibit A; *see also* Appendix in Support of Plaintiffs' Response to Defendant's Motion to Compel Arbitration and Stay All

Proceedings ("Plaintiffs' Appendix") (docket entry 11) at 9-51. Upon Nancy Crisler's death, the Trust Agreement directed that the trust assets were to be divided and allocated into trusts for the benefit of her husband William P. Crisler ("Crisler") if he was still living ("the Marital Trust") and for the benefit of the Freemans ("the Family Trust"). Petition ¶ 10. Crisler was the Freemans' stepfather. Plaintiffs' Appendix at 5, 54. The Trust Agreement further provided that upon the death of Crisler, the Marital Trust would terminate and all remaining assets of the Marital Trust would be distributed to the Family Trust for the benefit of and for distribution to the Freemans. Petition ¶¶ 11, 12.

The Trust Agreement expressly called for co-trustees, naming Crisler and Joseph Dial ("Dial"), Nancy Crisler's brother, in those capacities. *Id*. ¶¶ 9, 13. The Trust Agreement instructed co-trustees to ". . . act with respect to the management and affairs of both the Marital Trust and the Family Trust, including withdrawal, transfer and distribution of each trust's assets." *Id*. ¶ 13. Dial was not a beneficiary under the Trust Agreement. Plaintiffs' Appendix at 5, 54. The Freemans aver that "[t]he appointment of co-trustees was particularly critical to provide oversight of and constraints on Crisler, who was a trustee and also a primary beneficiary of both trusts . . . [, and] to make sure that Crisler, while acting as a trustee, (a) adhered to the standards and requirements of the Trust Agreement and (b) did not commit wrongful self-dealing, allow himself to become unduly influenced by another person, dissipate

the assets of the trusts, disregard the interests of Plaintiffs, and otherwise fail to discharge his fiduciary duties, including to act for the benefit of Nancy's children. . . ." Petition ¶ 14. The Trust Agreement further called for the appointment of a successor co-trustee in the event either Crisler or Dial relinquished their co-trustee duties and designated specific persons to serve as successor co-trustees. *Id*. ¶ 16; *see also* Plaintiffs' Appendix at 29-31.

In February 2003, Nancy Crisler died. Petition ¶ 15. In accordance with the Trust Agreement, her living trust assets then were reallocated to the Marital Trust and the Family Trust. *Id*.

On May 19, 2003, Dial resigned as a trustee. *Id*. ¶ 16. In violation of the terms of the Trust Agreement, Crisler did not notify any successor co-trustee that Nancy Crisler had designated them to serve as a successor co-trustee of the Marital Trust or the Family Trust following Dial's resignation. *Id*.; *see also* Plaintiffs' Appendix at 29-31. "Instead, despite also being a beneficiary, Crisler proceeded to manage the assets and affairs of both the Marital Trust and the Family Trust alone, without a co-trustee, in direct violation of the terms and requirements of the Trust Agreement." Petition ¶ 16.

Beginning in August 2004, acting as sole trustee, Crisler transferred the assets of the Marital Trust and the Family Trust to trust accounts managed by Fidelity. *Id*. ¶¶ 17, 18.

The Freemans assert that at all times the trust assets in Fidelity's possession were subject to trust restrictions and fiduciary obligations under the Trust Agreement. *Id*. ¶ 17. Fidelity received a hard copy of the Trust Agreement and thus knew of the co-trustee requirement to manage the assets and accounts of the trusts. *Id*. ¶¶ 18, 19; Plaintiffs' Appendix at 5, 54 ("According to Fidelity's records, which Fidelity provided after . . . Crisler passed away, Fidelity was provided with a copy of the Trust Agreement and had a copy of the Trust Agreement in Fidelity's file.").

Transfer of the Marital Trust and the Family Trust assets to Fidelity required Crisler to sign a Trust Account Application ("Fidelity Application") which incorporated a Fidelity Account Customer Agreement ("Customer Agreement"). Defendant's Opposed Motion to Compel Arbitration and Stay All Proceedings ("Motion") (docket entry 5) at 1, 3. The Freemans neither had knowledge of nor were involved with Crisler's decision to open or maintain the trust account at Fidelity and were not signatories to the documents executed by Crisler and Fidelity. Plaintiffs' Appendix at 5-6, 54-55. Fidelity contends that the Fidelity Application and Customer Agreement gave Fidelity the authority to execute transactions on behalf of the trusts and the Freemans. Motion at 3. The Fidelity Application, provided, in part, as follows:

> <u>I acknowledge that I have been furnished with a copy of the Fidelity Account Customer Agreement and that I have read, understood, and agree to be bound by its terms and</u>

> conditions as they are currently in effect and as they may be amended in the future.
>
> ***
>
> This account is governed by a predispute arbitration clause, which is found in Section 18 of the Customer Agreement. I acknowledge receipt of the predispute arbitration clause.

Defendant's Appendix in Support of Opposed Motion to Compel Arbitration and Stay All Proceedings ("Defendant's Appendix") (docket entry 6) at 13 (emphasis in the original).

The Customer Agreement contained the following clause.

> **18. Pre-Dispute Arbitration Clause** I agree that all controversies that may arise between us (including but not limited to controversies concerning this or any other account maintained with you), whether arising before, on or after the date this account is opened, shall be determined by arbitration in accordance with the rules then prevailing of either the New York Stock Exchange, Inc., or National Association of Securities Dealers, Inc. as I may designate.
>
> ***
>
> I am aware of the following:
> a. Arbitration is final and binding on the parties.
> b. The parties are waiving their right to seek remedies in court, including the right to jury trial.
> c. Pre-arbitration discovery is generally more limited than and different from court proceedings.
> d. The arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

> e. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

*Id*. at 21-22.

Though the Fidelity Application asked for background information and signatures of more than one trustee if applicable, only Crisler signed the application, and Fidelity opened the accounts with Crisler styled as the sole trustee despite the Trust Agreement's co-trustee requirement. Petition ¶ 18; *see also* Defendant's Appendix at 9, 13. Thereafter, the Freemans assert that Crisler "operated without the checks and balances of a co-trustee." Plaintiffs' Response to Defendant's Motion to Compel Arbitration and Stay All Proceedings ("Response") (docket entry 10) at 5.

Following Crisler's death on June 15, 2016,[*] the Freemans discovered that Crisler had "withdrawn, transferred, disbursed and depleted the assets of the trust accounts maintained at Fidelity, without the required involvement of a co-trustee, in violation of the terms and conditions of the Trust Agreement, and in breach of Crisler's fiduciary duties" with Fidelity's knowledge, participation, and support.

---

[*] After Crisler died, Roger Blackmar ("Blackmar"), listed as a successor co-trustee in the Trust Agreement in sequence after Dial, assumed management of the trusts and also executed a Fidelity account application and customer agreement. Motion at 4; *see also* Defendant's Appendix at 34-47; Plaintiffs' Appendix at 29. Thus, Fidelity contends that "the trust has now agreed to arbitration twice – once when the account was originally opened, and once shortly before bringing these claims." Motion at 4. The Freemans insist that they are not parties to an account application and customer agreement entered into by Fidelity and Blackmar. Plaintiffs' Appendix at 6, 55.

Petition ¶¶ 23, 24; *see also* Response at 5. Specifically, the Freemans allege that "Crisler withdrew, transferred or disbursed in excess of $1,000,000 of trust assets to himself, or to or for the benefit of persons other than [the Freemans]" over a period of years. Petition ¶ 21. The Freemans maintain that "[e]very such withdrawal, transfer of disbursement of trust assets out of the Marital Trust and the Family Trust, that was done by Crisler and permitted by Fidelity without the involvement and approval of a co-trustee, constituted a clear breach of fiduciary duty." *Id*. ¶ 22. They assert that although Fidelity knew the terms of the Trust Agreement, including the co-trustee requirement, Fidelity ignored those terms and "never took any measures to see that the trust assets in Fidelity's custody and possession were administered properly and protected from depletion by a single, self-interested trustee." Response at 5; *see also* Petition ¶¶ 19, 20. Prior to Crisler's death, the Freemans had not seen a copy of the Trust Agreement. Plaintiffs' Appendix at 5, 54.

On February 23, 2018, the Freemans filed this suit in the 68th Judicial District Court of Dallas County, Texas. *See generally* Petition. The Freemans sued Fidelity for breach of fiduciary duty and knowing participation in breach of fiduciary duty. *Id*. at 7-8. Specifically, the Freemans assert that Fidelity assumed a fiduciary duty of its own with respect to the Marital Trust and the Family Trust assets in its custody and possession, including the obligation to ensure that those assets were managed and disbursed in accordance with the Trust Agreement, and Fidelity breached that duty.

*Id*. ¶¶ 26-27. Additionally, the Freemans contend that Fidelity knowingly participated in Crisler's breach of fiduciary duty and actions in violation of the terms of the Trust Agreement. *Id*. ¶ 28.

On April 16, 2018, Fidelity removed the case to this court based on diversity of citizenship. Notice of Removal at 2. Fidelity asserts that the Freemans' claims for breach of fiduciary duty and knowing participation in breach of fiduciary duty fall within the scope of the arbitration clause of the Customer Agreement, and that the Freemans "ignored their obligation to arbitrate by bringing their claims in state court. . . ." Motion at 2. Accordingly, Fidelity moves to compel arbitration and stay all proceedings. See generally *id*. Conversely, the Freemans assert that they did not agree to arbitrate their claims, and that their claims are not within the scope of the arbitration provision that Fidelity seeks to enforce. Response at 1-2; *see also* Plaintiffs' Appendix at 6, 55 ("I did not consent to any arbitration provision with respect to the trust assets that were maintained under the Trust Agreement.").

## II.  ANALYSIS

### A.  Legal Standard

Federal law strongly favors arbitration. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); see also *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 24-25 (1983) ("The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."). Much like the federal policy, there is "a strong presumption in Texas public policy favoring arbitration and upholding the parties' intentions." *ASW Allstate Painting & Construction Company, Inc. v. Lexington Insurance Company*, 188 F.3d 307, 310 (5th Cir. 1999).

While there are strong federal and state policies favoring arbitration, the court does not yield to these policies when making the initial threshold determination about the existence of an agreement to arbitrate, *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008); *Will-Drill Resources, Inc. v. Samson Resources Company*, 352 F.3d 211, 214 (5th Cir. 2003), and the controversy must come within the contract's arbitration provision before the court can order arbitration. See *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) ("Although we have repeatedly expressed a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists."); *Certain Underwriters at Lloyd's of London v. Celebrity, Inc.*, 950 S.W.2d 375, 377 (Tex. App. – Tyler 1996, writ dism'd w.o.j.).

To decide whether parties should be compelled to arbitrate their dispute, the Fifth Circuit has developed a two-step inquiry. *OPE International LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir. 2001) (per curiam). First, the court

must determine "whether the parties agreed to arbitrate their dispute." *Id.* Two considerations guide the court in making this determination: (1) whether a valid agreement to arbitrate exists between the parties; and (2) if the court finds that the parties agreed to arbitrate, whether the dispute in question is within the scope of the arbitration agreement. *Id.*; *ASW Allstate Painting*, 188 F.3d at 311 (citing *Celebrity*, 950 S.W.2d at 377); *Henry v. Gonzalez*, 18 S.W.3d 684, 688-89 (Tex. App. – San Antonio 2000, pet. dism'd) (citation omitted). "The party seeking to compel arbitration need only prove the existence of an agreement to arbitrate by a preponderance of the evidence." *Grant v. Houser*, 469 Fed. Appx. 310, 315 (5th Cir. 2012) (per curiam).

Second, the court must ensure that no legal constraints external to the agreement have foreclosed arbitration of the disputed claims. *OPE International*, 258 F.3d at 446. If the court finds that this two-step inquiry is satisfied, arbitration must be ordered. *Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). Here, the court's analysis need only reach the first prong.

### B. Application

Fidelity seeks to compel arbitration according to the terms of the Customer Agreement. Motion at 1. Here, the Freemans do not contest that the arbitration clause would govern some disputes between Crisler and Fidelity. *See* Response at 6. Rather, the Freemans oppose Fidelity's motion to compel arbitration on two grounds.

First, the Freemans maintain that the court cannot enforce the arbitration clause against them because they are nonsignatories to the Customer Agreement. *Id*. at 1, 6. Second, the Freemans aver that should the court find the arbitration clause enforceable, their claims do not fall within the scope of the clause but instead arise entirely out of the Trust Agreement. *Id*. Specifically, the Freemans contend that they "assert breaches of fiduciary duties that arise under the *Trust Agreement* by trustee Crisler and . . . allege that Fidelity is jointly liable for those breaches of fiduciary duties *arising under the Trust Agreement* . . . claims based on the trustee's duties and liability under the Trust Agreement." *Id*. at 3 (emphasis in the original). On the other hand, Fidelity asserts that the "the only challenged conduct is Fidelity's execution of transactions pursuant to [the Customer] Agreement" which Fidelity classifies as the "sole connection" between the Freemans and Fidelity. Defendant's Reply in Support of its Opposed Motion to Compel Arbitration and Stay All Proceedings (docket entry 14) at 4.

The Fifth Circuit applies six theories under which a court may compel a nonsignatory to arbitration: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; and (6) third-party beneficiary. *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) (citations omitted), *cert. denied*, 541 U.S. 937 (2004); see also *Al Rushaid v. National Oilwell Varco, Inc.*, 814 F.3d 300, 305 (5th Cir. 2016); *G.T. Leach Builders, LLC v.*

*Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015). Fidelity contends that "[t]his case presents an uncommon twist on typical doctrines of equitable estoppel like 'direct benefits' and 'intertwined claims' estoppel" and thus the Customer Agreement's arbitration clause binds the Freemans as nonsignatory plaintiffs to arbitrate their claims. Motion at 8. The Freemans, on the other hand, insist their case "simply calls for application of ordinary principles of contract law" independent of the agreements between Fidelity and the trust, and equitable estoppel is thereby inapplicable. Response at 9; see also *id*. at 7-8.

The Fifth Circuit has described these two types of equitable estoppel as follows.

> The "intertwined claims" theory governs motions to compel arbitration when a *signatory-plaintiff* brings an action against a *nonsignatory-defendant* asserting claims dependent on a contract that includes an arbitration agreement that the defendant did not sign. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527-28 (5th Cir. 2000). It does not govern the present case, where a signatory-defendant seeks to compel arbitration with a nonsignatory-plaintiff. *Bridas*, 345 F.3d at 361. The "direct benefits" theory of equitable estoppel "prevents a nonsignatory from knowingly exploiting an agreement containing the arbitration clause." *Graves v. BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009). That is, "a nonsignatory cannot sue under an agreement while at the same time avoiding its arbitration clause." *Id*. This theory is inapplicable here because the Receiver does not seek to enforce the various contracts containing the arbitration agreements; rather, he seeks to unwind them and reclaim the benefits fraudulently distributed to the defendants under the contracts.

*Janvey v. Alguire*, 847 F.3d 231, 242-43 (5th Cir.) (per curiam), *cert. denied*, __. U.S. __, 138 S. Ct. 329 (2017) (emphasis added); *Academy of Allergy & Asthma in Primary Care v. Superior HealthPlan, Inc.*, No. SA-17-CV-1122-FB(HJB), 2018 WL 3338421, at *4 (W.D. Tex. May 1, 2018) ("[T]he "intertwined claims" theory is one used against non-signatory *defendants*, not non-signatory *plaintiffs*."), *report and recommendation adopted*, No. SA-17-CA-1122-FB, 2018 WL 4343441 (W.D. Tex. July 23, 2018); see also *Jones v. Singing River Health Services Foundation*, 674 Fed. Appx. 382, 385-86 (5th Cir. 2017); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 741 (Tex. 2005) ("We conclude that, under 'direct benefits estoppel,' although a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the non-signatory to the arbitration provision. Instead, a non-signatory should be compelled to arbitrate a claim only if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision.").

"A non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010); see also *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005) ("[A] litigant who sues based on a contract

subjects him or herself to the contract's terms."). "Although state law determines the validity of an arbitration agreement, courts have applied both federal and state law to determine the related, but distinct, issue of whether non-signatory plaintiffs should be compelled to arbitrate their claims." *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d at 738.

There is no evidence that the Freemans sought to derive direct benefits from or knowingly exploited the Customer Agreement, embraced the Customer Agreement as nonsignatories but now attempt to repudiate the arbitration clause, or that they brought suit against Fidelity premised on an agreement which includes or is intertwined with an arbitration clause. See *Bridas*, 345 F.3d at 361-62; see also *Gupta v. Lynch*, No. 12-1787, 2014 WL 4063831, at *4-*5 (E.D. La. Aug. 15, 2014); *Academy of Allergy & Asthma*, 2018 WL 3338421, at *4. Here, the Freemans seek to reclaim the monies alleged to have been fraudulently disbursed to Crisler.

Moreover, pursuant to the terms of the Trust Agreement, the trust assets were to be managed by co-trustees. Nowhere in the Trust Agreement does it state that the signature of co-trustee Crisler was sufficient to bind the trusts. Nevertheless, Fidelity permitted Crisler, acting alone and also in the capacity as a primary beneficiary, to sign the Fidelity Application, to open the Fidelity account, and to deplete the trust assets. Fidelity cannot now compel the Freemans, as nonsignatories to the Fidelity Application and Customer Agreement, to arbitrate. In short, there exists no valid and

enforceable arbitration agreement between the parties in this case. The court therefore need not consider whether there are any external legal constraints on arbitration.

### III. CONCLUSION

For the reasons stated above, Fidelity's motion to compel arbitration and stay all proceedings is denied.

**SO ORDERED.**

March 5, 2019.

_____
**A. JOE FISH**
**Senior United States District Judge**